**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 10:35 AM May 12, 2014**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 7 |
| JAMES R. RECUPERO AND CHRISTINE M. RECUPERO, | CASE NO. 13-60322 |
| | ADV. NO. 13-6089 |
| Debtors. | JUDGE RUSS KENDIG |
| DANIEL M. MCDERMOTT, | |
| Plaintiff, | **MEMORANDOM OF OPINION (NOT INTENDED FOR PUBLICATION)** |
| v. | |
| JAMES R. RECUPERO AND CHRISTINE M. RECUPERO, | |
| Defendants. | |

    James R. Recupero and Christine M. Recupero (collectively, "Debtors") filed a voluntary chapter 7 bankruptcy petition ("Petition") on February 15, 2013. Debtors' bankruptcy petition lists priority tax debts of $335,931.88 and general unsecured debts of $434,512.03. Debtors have few assets, evidenced by only $18,086.23 in personal property listed on Schedule B, even though Mr. Recupero has earned an average annual salary in excess of $100,000.00 over the four years immediately preceding bankruptcy. Daniel M. McDermott, the United States Trustee for Region 9 ("Trustee"), argues that Debtors' bankruptcy discharge should be denied because Debtors

1

attempted to conceal and transfer assets with the intent to hinder, delay, or defraud creditors in violation of § 727(a)(2)(A) and made inaccurate statements in their Petition in violation of § 727(a)(4). If discharge is not denied, Trustee argues that Debtors' case has been filed in bad faith and should be dismissed with prejudice under § 707(a). Debtors argue that Trustee has not presented evidence sufficient to justify a denial of discharge or the dismissal of the bankruptcy case. An evidentiary hearing was held on March 10, 2014, and briefs were filed by both parties on April 18, 2014.

The court has jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference dated April 4, 2012. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## I. Facts

Mr. Recupero is an attorney who built a successful law practice based on personal injury and domestic relations work. However, through a series of unwise financial decisions, outlined below, Mr. Recupero, along with his wife, acquired significant debts and decided to file for bankruptcy protection. In the following paragraphs, the court highlights the facts leading to Debtors' current situation.

### A. Mr. Recupero's Stock Trading and Employment Termination

Mr. Recupero graduated from law school in 1986 and immediately began working as an attorney at the law firm of Tzangas, Plakas, & Mannos. Mr. Recupero was successful and became a partner in 1991, and the law firm changed its name to Tzangas, Plakas, Mannos & Recupero ("Tzangas Plakas"). While at Tzangas Plakas, Mr. Recupero focused the majority of his time on personal injury cases, where he earned an annual income between $200,000.00 and $300,000.00. In addition to the practice of law, Mr. Recupero also began conducting significant stock trading activity from 1996 to 2004. Mr. Recupero's trading activity varied, but he often engaged in short term "day trading." Besides the normal buying and selling of stocks, Mr. Recupero also entered into margin calls, where an investor takes on debt in order to purchase additional securities. If the stock moves in the desired direction, margin calls can lead to large returns, but if the opposite occurs, an investor loses his principal and acquires new debt.

Mr. Recupero's financial problems began with the bursting of the tech stock market bubble around the end of the 1990s. Mr. Recupero was invested heavily in tech stocks and when the price of tech stocks declined sharply Mr. Recupero experienced large losses. While the exact amount is unknown, Mr. Recupero estimates his stock market losses to be between $500,000.00 and $1,000,000.00. In order to cover the debt associated with his margin accounts, Mr. Recupero took cash advances on over twenty credit cards which previously carried zero balances. As Mr. Recupero testified, "the stock market really got me into a problem." Additionally, because Mr. Recupero's primary occupation at the time of the stock losses was as an attorney, he was not able to deduct his stock market losses from his regular income. Mr. Recupero has not traded stocks since 2004.

In addition to stock market losses, Mr. Recupero also accrued large tax liabilities. As of the filing of the bankruptcy petition, Mr. Recupero had unpaid tax liabilities totaling $234,313.72 attributable to tax years 2001 through 2004. Mr. Recupero testified that the tax liabilities arose from the increase in the value of his partnership interest in Tzangas Plakas as well as his normal practice of not making estimated tax payments throughout the year. Instead, Mr. Recupero would make one large tax payment after he completed his tax return, and would enter into a payment plan with the IRS if necessary. Before 2001, Mr. Recupero was able to make his annual tax payments, but stock market losses eliminated his ability to do so. Mr. Recupero also accumulated tax liabilities of $101,618.20 for tax years 2009 through 2011.

While Mr. Recupero's tax liabilities and stock losses were very large financial problems, an even greater blow occurred when he was terminated by Tzangas Plakas in March of 2004. The sequence of events leading to his termination are as follows. In 2003 and 2004 Tzangas Plakas began searching for new office space, and as part of the search required financial information from each partner. Mr. Recupero attempted to delay giving this information. Eventually, Mr. Recupero disclosed his large tax debts and stock market losses. After learning of his debts, the other partners at Tzangas Plakas held a closed-door meeting to which Mr. Recupero was not invited. At this meeting the partners discussed Mr. Recupero's status as a partner, and eventually decided that Mr. Recupero should be terminated. The reasons given for the termination were Mr. Recupero's large tax debts as well as the significant portion of time he devoted to day trading, time the other partners felt should have been devoted to the practice of law. The termination lead to a lawsuit, which eventually settled with Mr. Recupero receiving $275,000.00 from Tzangas Plakas. After lawyers' fees and other expenses, Mr. Recupero received approximately $175,000.00. Mr. Recupero also closed out a 401(k) with Tzangas Plakas worth approximately $82,000 in 2005.

In addition to mounting tax debts, Mr. Recupero's stock market losses and termination of employment created other financial strains. Debtors originally owned a home on Parfoure Boulevard in Uniontown, Ohio with a value of approximately $500,000.00. Debtors were unable to continue making the required payments and the home was lost in foreclosure. Debtors currently live in a condominium with a value of $270,000.00 that is titled in the name of Pamela Reece, who is Mr. Recupero's legal secretary. Debtors also previously owned four vehicles: a Honda Pilot, a Honda S2000, a Jeep Wrangler, and an Acura RL. All of the vehicles were foreclosed upon or sold. Debtors currently own only one vehicle, a 2005 Saturn Vue. While Debtors did reduce some of their living expenses, over the same timeframe Debtors contributed $17,000.00 towards their two daughters' weddings, took a vacation to Italy, and accumulated significant credit card obligations.

### B. Mr. Recupero's New Law Firm and Continued Tax Trouble

While Mr. Recupero was employed at Tzangas Plakas, he was in discussions with the IRS regarding a potential payment plan to cover his unpaid taxes. When he lost his position with Tzangas Plakas, the IRS agreed not to attempt to collect back taxes for five years, hopefully giving Mr. Recupero time to build a new law practice named Recupero & Associates ("R&A"). While Mr. Recupero did initially inform the IRS that he was engaged in litigation with Tzangas

3

Plakas, there is no evidence that Mr. Recupero informed the IRS that he received a settlement of $275,000.00. Mr. Recupero first attempted to build R&A around personal injury work, but tort reform passed in 2010 which hindered his efforts. Mr. Recupero then attempted to shift his work towards domestic relations, but the "Great Recession" beginning around 2009 also caused legal work in that field to slow. While Mr. Recupero did have some successful years while working at R&A, such as 2009 where the adjusted gross income reported on his tax return was $164,901.00, Mr. Recupero never reached the income levels he enjoyed at Tzangas Plakas.

While Debtors have earned significant income since Mr. Recupero's termination from Tzangas Plakas, Debtors have not made significant tax payments. For example, from 2011 to 2013 Debtors earned approximately $350,000.00 in income, leading to taxes in 2011, 2012, and 2013 of $76,320.51, $65,783.00, and $19,191.27, respectively. However, even with annual income in excess of $100,000.00, Debtors have only made approximately $2,000.00 in total tax payments, which includes both current and back taxes. Additionally, during the times that Mrs. Recupero worked for R&A, her federal tax withholdings were extremely low. Mr. Recupero claims that he is not sure why Mrs. Recupero's tax withholdings were so small, as this would have been something determined by his accountant. As noted above, over this same timeframe Debtors made significant luxury purchases and accumulated $434,512.03 in general unsecured debts. Trustee believes the spending is evidence that Debtors lived beyond their means for a long period of time, a time when payments should have been made on tax liabilities and other debts, especially considering Mr. Recupero's substantial income.

### C. Debtors' Creation and Use of the JC Tan Checking Account

Well before the above financial difficulties, Mr. Recupero began operating a company known as JC Tan, Inc. ("JC Tan"). JC Tan was an aerial photography company that would fly over piles of coal, take pictures, and then estimate the amount of coal in the pile. JC Tan was originally incorporated in 1989, but had its corporate charter revoked in 1995. While operating JC Tan, Mr. Recupero opened a bank account in the company's name. The JC Tan bank account is a "Business Economy Checking Account" and is in the name of "J C Tan Inc." All of the checks written from the JC Tan bank account have Debtors' names and home address written in the top left corner. Both Mr. and Mrs. Recupero have check signing authority on the JC Tan bank account. Debtors admit that personal expenses are paid out of the JC Tan bank account.

Mr. Recupero testified that his personal income, as well as any income earned by his wife, is deposited into the JC Tan account. The JC Tan bank account was disclosed in the Petition. At the time of bankruptcy filing, Mr. Recupero could not remember if he or his wife had a personal bank account, and a personal account was not listed in the Petition. Mr. Recupero testified as follows at his deposition, which was read into evidence at the evidentiary hearing, regarding the reason he uses the JC Tan bank account as a personal account:

> [Trustee]: Do you have a personal checking account or one in your name?
> Mr. Recupero: No.
> . . .
> [Trustee]: And can you tell me why?

4

> Mr. Recupero: Because over the years people were taking
> judgments against myself and my wife and one time they attached
> our personal bank account for a couple thousand dollars, it threw a
> whole bunch of checks into bounce status and then I started using
> J.C. Tan.

After reviewing his deposition testimony at the evidentiary hearing, Mr. Recupero backed away from his prior testimony. Instead, Mr. Recupero stated that he "had used the JC Tan account all along," meaning he did not start using the JC Tan account when creditors obtained judgments against him, but instead had been using the business account for personal expenses long before any creditor judgments. In the year before bankruptcy Debtors transferred $44,513.00 into the JC Tan account, and in the two years preceding bankruptcy $94,710.00 was transferred.

### D. Debtors' Agreement with Mrs. Reece to Purchase a New Condominium

After the foreclosure on Debtors' home on Parfoure Boulevard, Mrs. Reece approached Debtors about purchasing a residence to be used by Debtors. The original plan was for Debtors to provide Mrs. Reece with a down payment, have Mrs. Reece purchase a condominium in her name, rent the condominium to Debtors, and then sell the condominium to Debtors when R&A began to earn more income. Debtors eventually settled on a condominium on Putney Court in Massillon, Ohio. To effectuate the plan, Debtors provided Mrs. Reece with $50,000.00 to be used as a down payment. Mrs. Reece purchased the condo for $277,500.00, took a mortgage of $222,000.00, and then opened a second mortgage for $37,500.00. The second mortgage was used to repay part of Debtors' $50,000.00 down payment. The remaining balance of the down payment was repaid via Mrs. Reece's forgiveness of wages owed to her by R&A. After the purchase of the condominium, Debtors immediately began living in the condominium and made all of the associated payments, including the mortgage, property taxes, insurance, and condominium association fees. The monthly mortgage payment of $1,225.55, as well as all other condominium expenses, were made directly from the R&A bank account. In the year preceding bankruptcy, Debtors made approximately $17,700.00 in transfers from the R&A bank account for condominium expenses. In 2006, Debtors claimed $51,707.00 in home mortgage interest, even though the legal title to the condominium was held by Mrs. Reece. Mr. Recupero was unable to explain the reason for the home interest deduction in 2006, stating that he was unsure where his accountant derived the deduction. Mr. Recupero took the standard deduction on his tax returns after 2006. As an explanation for the unusual transaction, Mr. Recupero testified that he needed Mrs. Reece to purchase the condominium because he would have an extremely difficult time obtaining a loan in light of his various financial problems.

### E. The Inaccuracies in Debtors' Bankruptcy Petition

Debtors' initial Petition was not completely accurate. Debtors asserted at their 341 meeting of creditors that all of the statements in the bankruptcy petition were full, complete, and accurate. Debtors also signed the petition claiming that the schedules were accurate and complete. However, Debtors' Petition listed income of $15,757.80 generated by JC Tan in 2012. JC Tan had its corporate charter revoked in 1995 and had not engaged in any business for over

fifteen years. Trustee argues that Debtors initially claimed JC Tan earned income in order to give the appearance that Debtors' use of the JC Tan account was justified. Debtors also initially claimed income of $53,124.50 from other sources, arriving at total income of $68,882.30 in 2012. Debtors later amended their bankruptcy schedules, eliminating the income generated by JC Tan and instead claiming total income of $91,220.00. While the amended bankruptcy schedules were filed after Trustee's complaint to deny discharge, Debtors state that they amended their schedules as soon they completed their 2012 tax return and learned their actual 2012 income. Debtors also did not disclose transfers to the JC Tan bank account or any ownership interest in the condominium.

## II. Law & Analysis

As noted above, Trustee has raised three central arguments: (1) that Debtors transferred or concealed assets with the intent to hinder, delay, or defraud creditors in violation of § 727(a)(2)(A); (2) Debtors made false oaths in their bankruptcy petition in violation of § 727(a)(4); and (3) Debtors' bankruptcy case was filed in bad faith and should be dismissed with prejudice under § 707(a). Trustee's first and second arguments would result in the complete denial of discharge for all of Debtors' debts. Trustee's third argument, if successful, would lead to the dismissal of the current bankruptcy case with prejudice. Debtors contest each claim, arguing that Trustee has not presented the evidence necessary to bar discharge.

The court first notes that a bankruptcy discharge effectuates the overarching policy of the United States Bankruptcy Code ("the Code"), that the honest but unfortunate debtor should receive a fresh start. Lowry v. Nicodemus (In re Nicodemus), 497 B.R. 852, 858 (B.A.P. 6th Cir. 2013). In other words, the Code's main purposes is "to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." Williams v. U. S. Fid. & Guar. Co., 236 U.S. 549, 554–55 (1915). To effectuate the policy, a chapter 7 debtor will normally receive a discharge of pre-petition debts, unless a specific exception from § 727(a) is satisfied. The various limitations within § 727 give creditors "a vehicle under which abusive debtor conduct can be dealt with by denial of discharge." Wilson & Muir Bank & Trust Co. v. Eifler (In re Eifler), 2013 WL 3300639, at *19 (Bankr. W.D. Ky. 2013). Section 727(a) should be construed liberally in favor of the debtor and strictly against the creditor. Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 281 (6th Cir. 1998). "Completely denying a debtor his discharge . . . is an extreme step and should not be taken lightly." Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993).

### A. Debtors Transferred and Concealed Assets with the Intent to Hinder, Delay, or Defraud Creditors in Violation of § 727(a)(2)(A)

Section 727(a)(2)(A) of the Code states that a discharge should not be granted to a debtor who "with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of filing the petition." "The purposes of [§ 727(a)(2)(A)] is to prevent the discharge of a debtor who attempts to avert collection of his debts by concealing of otherwise disposing of assets." Nat'l City Bank v. McNamara (In re McNamara), 89 B.R. 648, 650 (Bankr. N.D. Ohio 1988). To find a violation

6

of § 727(a)(2)(A) the following four prongs must be satisfied: (1) the disposition of property, such as a transfer or concealment, (2) "a subjective intent on the debtor's part to hinder, delay, or defraud a creditor through the act of disposing of the property," (3) the property at issue must be property of the debtor, and (4) the disposition occurred within one year of filing for bankruptcy. Keeney v. Smith (In re Keeney), 227 F.3d 646, 654 (6th Cir. 2000); Barbacci v. Worrell (In re Worrell), 2013 WL 4525227, at *2 (Bankr. N.D. Ohio 2013). Trustee bears the burden of proof on each element of a § 727(A)(2)(A) claim by a preponderance of the evidence. Barclays/Am. Bus. Credit v. Adams (In re Adams), 31 F.3d 389, 394 (6th Cir. 1994). Debtors do not argue that the property in question is not property of the estate or that the alleged transfer or concealment occurred outside one year of the Petition date.[1]

1.  **Debtors Transferred and Concealed Property from Trustee and Creditors**

The first element requires the transfer, removal, destruction, or concealment of a debtor's property. Buckeye Ret. Co. v. Swegan (In re Swegan), 383 B.R. 646, 653 (B.A.P. 6th Cir. 2008). At issue in the current case are transfers between Debtors and the JC Tan bank account, Debtors' alleged concealment of assets within the JC Tan bank account, and the status of a condominium where Debtors reside that is titled in the name of Mr. Recupero's legal secretary. The court will first analyze Debtors' movement of funds into the JC Tan account.

Debtors argue that a transfer could not have occurred between Debtors and JC Tan, as the revocation of JC Tan's corporate charter in 1995 resulted in Debtors and JC Tan being the same entity. Under Debtors' theory, a debtor is unable to transfer assets from himself to himself. Trustee argues that Debtors' use of the JC Tan bank account to shield income from creditors indicates that a transfer occurred under the Code.

The Code defines transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(54). When drafting the Code, "Congress intended the term 'transfer' to be as broad as possible and, therefore, defined the term expansively." Roberts v. Oliver (In re Oliver), 414 B.R. 361, 377 (Bankr. E.D. Tenn. 2009); 6 Collier on Bankruptcy, ¶ 727.02[5] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2013) (the definition of transfer "is intended to be as broad as possible, to include any disposition of property or an interest in property"). The Senate Report discussing changes to the definition of "transfer" further clarifies the word's scope within the Code, stating that "any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control *even if there is not transfer of title*, because possession, custody, and control are interest in property." S. Rep. No. 95-989, at 27 (1978) (emphasis added); In the Matter of Smiley, 864 F.2d 562, 565 (7th Cir. 1989); Martin v. Bajgar (In re Bajgar), 104 F.3d 495, 498-99 (1st Cir. 1997); 6 Collier on Bankruptcy, ¶ 727.02[5]. Extremely relevant to the current dispute, the same Senate Report

---

[1] While not raised as a defense by Debtors, Mrs. Reece's purchase of the condominium occurred before the one year look-back period of § 727(a)(2)(A). However, the continuing concealment doctrine, which has been adopted by the Sixth Circuit, would apply in the current case and bring the condominium within the reach of § 727(a)(2)(A). In re Keeney, 227 F.3d at 684.

7

explicitly states that "[a] deposit in a bank account or similar account is a transfer." S. Rep. No. 95-989, at 27 (1978).

Based on the Code's broad definition of transfer, as well as congressional intent, a deposit or withdrawal from a bank account constitutes a transfer, even if the debtor is making a withdrawal or deposit into or from a personal account. Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279 (9th Cir. 1996); A&H Ins., Inc. v. Huff (In re Huff), 2014 WL 904537, at *6 (B.A.P. 9th Cir. 2014); Jackson Law Office, P.C. v. Herman (In re Herman), 2009 WL 483214, at *7 (Bankr. E.D. Tex. 2009); Freelife Int'l, LLC v. Butler (In re Butler), 377 B.R. 895, 817–18 (Bankr. D. Utah 2006); Clark v. Wilbur (In re Wilbur), 211 B.R. 98, 104 (Bankr. M.D. Fla. 1997). For example, in In re Bernard, the debtor withdrew $44,010.00 from a personal bank account and hid the money in a safe within his home. 96 F.3d at 1281. The court concluded that the debtor "intentionally and successfully hindered [collection efforts] by making withdrawals from accounts which were under threat of attachment [and] now seeks to avoid denial of discharge by hiding behind a narrow reading of the word 'transfer' as defined by the Bankruptcy Code. 'Transfer' is too broad to allow this result." Id. at 1283.

In the current case, the court finds that a "transfer" has occurred within the meaning of § 727(a)(2)(A). While there is a dispute as to whether JC Tan, a corporate entity that had its corporate charter revoked in 1995, retains its corporate identity or becomes the alter ego of Debtors, the court need not decide the issue. Even assuming that Debtors and JC Tan are the same entity, a change in title is not necessary for a "transfer." The court finds the withdrawal and subsequent hiding of money from In re Bernard to be analogous to Debtors' transfer of wages into a bank account held in a corporate name, as both actions result in assets being hidden from creditors. Based on the wording of the Code and the intent of Congress, Debtors' actions constitute a transfer.

Additionally, because the word "or" is used in § 727(a)(2)(A), a transfer is not required, as the concealment of property, even without an associated transfer, is sufficient. 11 U.S.C. § 727(a)(2)(A); In re Keeney, 227 F.3d at 682–83. Concealment occurs when a debtor withholds information otherwise required to be disclosed by law. In re Swegan, 383 B.R. at 654. Under this standard, concealment occurs when a debtor fails to adequately and truthfully answer a question at a state-court debtor's examination, at a 341 meeting of creditors, within a bankruptcy petition, or in other similar situations. Id. at 655. A concealment may also occur when assets are placed beyond the reach of creditors, such as moving property of the estate in a manner that makes it harder for creditors to reach the property. In re Keeney, 227 F.3d at 682–83; In re Adams, 31 F.3d at 392–94; Pher Partners v. Womble (In re Womble), 289 B.R. 836, 854 (Bankr. N.D. Texas 2003); Consumers United Capital Corp. v. Green (In re Green), 202 B.R. 68, 73 (Bankr. D. Md. 1996) (holding that the transfer of assets to a wholly owned corporation may constitute a concealment); 6 Collier on Bankruptcy, ¶ 727.02[6][b]. For example, in In re Adams, the Sixth Circuit determined that creating bank accounts difficult to link to the debtor, and then transferring funds into the new accounts on the eve of bankruptcy, is an act of concealment. 31 F.3d 392–94. Concealment may also occur when a debtor transfers "legal title to property to a third party with the retention of a secret interest." Ohio Citizens Trust Co. v. Smith (In re Smith), 11 B.R. 20, 22 (Bankr. N.D. Ohio 1981); Kaler v. Craig (In re Craig), 195 B.R. 443, 449 (Bankr. D.N.D. 1996). For example, if a debtor lives in and makes all of the mortgage, insurance,

8

maintenance, and homeowner's association payments on a residence, but that residence is titled in the name of another, a debtor likely has an equitable ownership in the property that needs to be disclosed in a bankruptcy petition. In re Keeney, 227 F.3d at 684; In re Olivier, 819 F.2d at 553; First Fed. Life Ins. Co. v. Martin (In re Martin), 698 F.2d 883 (7th Cir. 1983); Vidro v. Vidro (In re Vidro), 497 B.R. 678, 687–88 (Bankr. E.D.N.Y. 2013); but see Buckeye Ret. Co. v. Hake (In re Hake), 387 B.R. 490, 502–04 (Bankr. N.D. Ohio 2008) (holding that a debtor did not have an equitable interest in real estate on which he lived and paid all associated expenses, but was titled to a third party, because the real estate was transferred in an arms-length transaction for adequate consideration).

In the current case, Debtors' deposit of personal earnings into the JC Tan bank account constitutes a concealment. While the JC Tan bank account has been in existence since well before the filing of the Petition, the company has been inactive for approximately twenty years. And even though Debtors' names and home address are on each JC Tan check, their names do not appear anywhere in the JC Tan bank statements. Debtors' use of the JC Tan account makes it harder for creditors to reach their assets. Debtor admitted as such in his deposition testimony, stating that he began using the JC Tan account because creditors were able to attach judgments against his personal bank accounts. Simply because JC Tan's corporate charter has been revoked does not negate the effect of Debtors' use of the JC Tan account, which was to hinder collection efforts. In re Adams, 31 F.3d at 73.

Debtors are also involved in an unusual financial transaction with Mr. Recupero's legal secretary, Mrs. Reece. Debtors provided Mrs. Reece with a $50,000.00 loan to be used as a down payment on a condominium where Debtors would live. After purchasing the condominium, Mrs. Reece took out a second mortgage which allowed for the partial repayment of Debtors' down payment. The remainder of the down payment was repaid by the forgiveness of wages owed to Mrs. Reece by R&A. Debtors make all of the associated payments on the condominium, but the property is nevertheless titled in Mrs. Reece's name. The current case is similar to In re Vidro, where the debtors transferred their interest in real estate to a family member, but continued to live within and make all of the payments associated with the property. 497 B.R. at 683. The court decided that even though debtors did not have legal title to the property, they nevertheless retained a beneficial ownership which had been concealed from creditors. Id. at 688.

Based on the above facts and relevant case law, the court finds that Debtors have an equitable interest in the condominium. Schedule A of the Petition asks Debtors to disclose "any legal, equitable, or future interest" in real property, and in response to the question Debtors answered "none." Courts have found that the failure to disclose an equitable interest in real property can constitute concealment. In re Swenson, 381 B.R at 289. While most cases dealing with the concealment of a residence focus on the transfer of property already owned by a debtor, instead of the purchase of new property, the underlying theory is the same under either scenario. When a third party has title to a piece of property but does not make any regular payments towards the property, any equity, which potentially could benefit a debtor's creditors, is shifted to the third party. In the current case, Mrs. Reece contributed very little to the purchase of the condominium, but still receives any equity accruing in the property, protecting the asset from Debtors' creditors. The first elements of a § 727(a)(2)(A) claim is satisfied.

9

### 2. Debtors Had the Subjective Intent to Hinder, Delay, or Defraud Creditors

Because the court has determined that Debtors transferred and concealed property, the next step is to determine whether they engaged in the prohibited actions with the "intent to hinder, delay, *or* defraud a creditor." 11 U.S.C. § 727(a)(4)(A) (emphasis added). To make the determination the court must look to the debtor's subjective state of mind. In re Keeney, 227 F.3d at 684. A debtor's reckless disregard or indifference to the truth may be sufficient to show actual fraudulent intent. Montedonico v. Beckham (In re Beckham), 2009 WL 1726526, at *7 (B.A.P. 6th Cir. 2009). Because § 727(a)(2)(A) is written in the disjunctive, a debtor only needs to have the subjective state of mind to "hinder, delay, *or* defraud." 11 U.S.C. § 727(a)(2)(A) (emphasis added); In re Keeney, 227 F.3d at 684. Therefore, a debtor satisfies the intent requirement when his actions illustrate the "intent to improperly make it more difficult for creditors to reasonably collect on their debts." In re Womble, 289 B.R. at 854; In re Eifler, 2013 WL 3300639, at *19 ("Using a plain reading of the statute, if the debtor . . . transfers property with the intent of frustrating creditors by keeping the property out of [the creditor's] reach, then the debtor is not entitled to discharge."); Wachovia Bank, N.A. v. Spitko (In re Spitko), 357 B.R. 272, 303 (Bankr. E.D. Pa. 2006) (holding that transferring assets to personal bank accounts in another state may illustrate the subjective intent to hinder collection efforts). There is no requirement that the creditor actually be harmed by the debtor's actions. In re Keeney, 227 F.3d at 685.

Because a debtor will rarely, if ever, admit to having the requisite intent, courts look to "badges of fraud" to assist in the determination. U.S. Tr. v. Zhang (In re Zhang), 463 B.R. 66, 78 (Bankr. S.D. Ohio 2012). Badges of fraud are "circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them." Schilling v. Heavrin (In re Triple S Rests., Inc.), 422 F.3d 405, 414 (6th Cir. 2005). Courts have cited numerous factors, but the following are the most common:

> (1) a lack of adequate consideration for the property transferred;
> (2) a family or close relationship between the parties; (3) the retention or possession for use and benefit; (4) the financial condition of the transferor before and after the transfer; (5) the cumulative effect of the transactions and course of conduct after the onset of financial difficulties or threat of suit; and (6) the general chronology and timing of events

C & H Elec. v. Newell (In re Newell), 321 B.R. 885, 890 (Bankr. N.D. Ohio 2005). The above list, or any list outlined by a court, is not exhaustive, as additional factors may be evaluated as individual circumstances require. Silagy v. Morris (In re Morris), 2013 WL 5705630, at *18 (Bankr. N.D. Ohio 2013). If a sufficient number of badges of fraud are present, a presumption of fraudulent intent arises against the debtor. In re Worrell, 2013 WL 4525227, at *3. At that point, a debtor must provide evidence to rebut the presumption. Id. at *4. Moreover, "[j]ust one wrongful act may be sufficient to show actual intent ... [although] a continuing pattern of wrongful behavior is a stronger indication." Gordon v. Courtney (In re Courtney), 351 B.R. 491, 501 (Bankr. E.D. Tenn. 2006).

### i. Trustee Provided Evidence Sufficient to Create a Presumption of Intent Sufficient to Deny Discharge

Applying the above badges of fraud, courts have found that debtors acted with the intent necessary to deny discharge in a number of situations with parallels to the current case. For example, when a debtor transfers assets to another without receiving adequate consideration (especially a person with a close relationship to the debtor), but retains control over the assets, the debtor likely has the intent necessary to deny discharge. Village of San Jose v. McWilliams, 284 F.3d 785 (7th Cir. 2002); Salomon v. Kaiser (In re Kaiser), 722 F.2d 1574 (2d Cir. 1983); In re Zhang, 463 B.R. at 83. For example, in In re Kaiser, the court determined that the debtor's transfer of property to his wife, while retaining control over the property, was evidence of the debtor's intent to improperly shield the asset from creditors. 722 F.2d at 1583. Specifically related to real estate, courts have often found a debtor to have the requisite intent when he transfers title to a third party, but continues to live in and make all payments associated with the real estate. In re Keeney, 227 F.3d at 683–84; In re Martin, 698 F.2d at 887; In re Vidro, 497 B.R. at 687 ("In the case of residential real estate property . . . where a debtor makes all mortgage, insurance, and maintenance payments on and lives in property owned by another, he may be found to have fraudulently concealed his interest by maintaining the property in the other's name." (internal quotation marks omitted)); United States v. Swenson (In re Swenson), 381 B.R. 272, 292–93 (Bankr. E.D. Ca. 2008). The existence of a rental agreement does not foreclose the possibility of a debtor having an equitable interest in the property, assuming the court finds the rental agreement is intended to obscure the true nature of the property's ownership. In re Swenson, 381 B.R. at 291–92.

A debtor need not transfer property already in his possession. Transferring funds to a third party to be used to purchase and title an asset in the third party's name, when the asset will actually be used by the debtor, illustrates the intent necessary to deny discharge. In re McNamara, 89 B.R. at 651–52; Hill v. Jones (In re Jones), 327 B.R. 297, 302 (Bankr. S.D. Tex. 2005). Additionally, simply because adequate consideration is initially transferred does not insulate a transaction from scrutiny. For example, in In re Oliver, the debtor transferred title in his residence to his mother (to protect the asset from a personal injury claim) in exchange for $15,000.00. 819 F.2d at 551. However, the $15,000.00 was returned to the debtor's mother a few days later, indicating the debtor's subjective intent to hinder, delay, or defraud creditors when he transferred a major asset to a family member without consideration while maintaining the use and enjoyment of the asset. Id. at 553–54.

A transfer does not need to be to another individual to be fraudulent, as a debtor's transfer of assets to a wholly owned corporation without adequate consideration may be sufficient to deny discharge. In re Green, 202 B.R. at 72–73; Fru-Con Constr. Corp. v. Araujo (In re Araujo), 2011 WL 4054856, at *4 (Bankr. D. Md. 2011); First Sav. Bank v. Turner (In re Turner), 335 B.R. 755, 762–63 (Bankr. D.N.M. 2005); In re Womble, 289 B.R. at 854. A transfer need not even be to a separate entity, as the withdrawal of assets from a bank account and the subsequent hiding of those same assets can constitute the necessary intent. In re Adams, 31 F.3d at 392–94; In re Bernard, 96 F.3d at 1281. For example, in In re Adams, creating new bank accounts in different states, and then transferring funds to the newly created accounts, illustrates

11

the intent to hinder creditors. 31 F.3d at 392–94. A debtor need not even transfer assets that are in his possession, as funneling income to an account held by another may illustrate the necessary intent. Coady v. D.A.N. Joint Venture III, L.P. (In re Coady), 588 F.3d 1312, 1314 (11th Cir. 2009) (holding that a debtor's funneling of income to his wife's company by claiming to be an unpaid contractor of the company is a badge of fraud); Deangelis v. Von Kiel (In re Von Kiel), 461 B.R. 323, 338–40 (Bankr. E.D. Pa. 2012) (holding that a debtor's "vow of poverty" and subsequent assignment of his $150,000.00 salary to a religious organization, but maintaining his lifestyle through "gifts" from the religious organization, shows the requisite intent to deny discharge).

In the current case, the court first looks to Debtors' use of the JC Tan bank account. Initially, it is clear that funneling personal earnings to another entity may be sufficient to deny discharge. In re Coady, 588 F.3d at 1314; In re Von Kiel, 461 B.R. at 338–40. A number of badges of fraud are also present in the transfers between Debtors and JC Tan, such as: (1) a very close relationship between the parties; (2) the assets transferred to the JC Tan account remain available for Debtors' use; (3) Debtors were insolvent when making the transfers; and (4) essentially all of Debtors' income was transferred to JC Tan (except for assets paid directly by R&A for Debtors' condominium). Additionally, in his deposition testimony, Mr. Recupero admitted that the reason he began using the JC Tan account was to protect his assets from creditor attachment. Courts have found very similar testimony to be sufficient to deny discharge without significant additional evidence. See e.g., Marrama v. Citizens Bank of Mass. (In re Marrama), 445 F.3d 518, 523 (1st Cir. 2006); First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986); In re Greene, 202 B.R. at 72–73; In re Jones, 327 B.R. at 303. Debtor backed away from his deposition testimony at the evidentiary hearing, stating that he used the JC Tan account as a personal account long before any creditor attachment. Debtor provides little explanation for why he began to use of the JC Tan account, except for the general statement that small business owners often use their business accounts for personal expenses. The court finds Mr. Recupero's deposition testimony to be the more credible explanation.

Further, the maintenance of an account for a non-existent entity is clearly fraud. Imagine a rule that would permit a debtor to establish fictitious accounts for non-existent entities in order to hide money. This is unthinkable. Clearly, Debtors were stashing money in an account titled in the name of a non-existent entity in order to mislead, delay, and defraud creditors. There is no other, possible purpose.

The court also notes that Debtors' financial transactions, when taken as a whole, are indicative of an intent to harm creditors. After his termination from Tzangas Plakas, Mr. Recupero entered into an agreement with the IRS to delay payment on his tax obligations for five years in order to give R&A a chance to succeed. Shortly thereafter, Mr. Recupero received a large settlement from Tzangas Plakas, but did not inform the IRS of the settlement. While it is possible that the IRS may have allowed Mr. Recupero to keep the settlement to start R&A, the IRS should have at least been notified. Additionally, in the years 2008 through 2012, Mr. Recupero earned adjusted gross income totaling $508,113.00, but only paid $2,000.00 in taxes. Not only did Debtors fail to pay new tax obligations as they became due, but also failed to use their substantial income to pay back taxes. For example, in 2009 Mr. Recupero earned an adjusted gross income of $164,901.00 and owed taxes of $47,126.00 on that income. As of

February 15, 2013, Debtors still owe 2009 taxes of $46,485.00. Other years paint a similar story, as in 2012 Mr. Recupero owed taxes of $10,170.00, and as of February 15, 2013 $9,991.00 remains outstanding. During this same timeframe, Debtors made significant contributions to their children's weddings and took a trip to Europe. The court does note that Debtors have significantly reduced the value of their residence as well as decreasing their vehicles from four to one. However, Debtors "downsized" condominium was nevertheless purchased for approximately $270,000.00. Debtors also accrued substantial credit card debt over the same timeframe. The above facts are similar to the case of In re Swenson, where the court denied discharge in part because of the debtor's failure to pay their debts, especially tax debts, when the debtors had the financial ability to do so. 381 B.R. at 277, 281–82, 292–93.

Finally, the court believes that Mrs. Reece's purchase of the condominium using cash provided by Debtors, as well as Debtors' payment of all associated condominium costs, evidences an intent to hinder, delay, or defraud creditors. First, the court notes that a large number of courts have determined that a debtor's transfer of title in real property to a third party, while the debtor continues to make all associated payments and live within the property, is a classic badge of fraud. In re Keeney, 227 F.3d at 683–84; In re Martin, 698 F.2d at 887; In re Vidro, 497 B.R. at 687. When a debtor gives money to a third party to purchase property titled in the third party's name, but the debtor will use and make all of the payments associated with the property, the debtor likely has the subjective intent sufficient to deny discharge. In re Jones, 327 B.R. at 302; In re McNamara, 89 B.R. 648, 651–52. In the current case, Debtor gave Mrs. Reece $50,000.00 to be used as a down payment on a condominium. After Mrs. Reece's purchase, Debtors began to live in the condominium and make all of the associated payments. In 2006, Debtors took a tax deduction of over $50,000.00 associated with the condominium. Taking a tax deduction on property titled in the name of another is evidence of an equitable ownership in the property. In re Swenson, 381 B.R. at 291. Even with all of the above benefits, Debtors did not list the condominium within their bankruptcy schedules or claim to have an interest in the property. The titling of the property in Mrs. Reece protects any equity in the condominium from Debtors' creditors.

      ii.  **Debtors Fail to Rebut the Presumption of Subjective Intent Sufficient to Deny Discharge**

Based on the foregoing, Trustee has presented evidence of numerous badges of fraud that create a presumption of Debtors' fraudulent intent. Debtors must now present evidence to rebut the presumption. However, as described below, Debtors have not presented sufficient evidence.

Debtors first argue that "small business owners use their business accounts routinely to pay personal expenses" in an attempt to convince the court that Debtors' use of the JC Tan and R&A accounts were not with the subjective intent to hinder, delay, or defraud creditors, but were instead very normal small business activity. Debtors cite no legal authority for such a statement. Additionally, Debtors are not paying personal expenses with income generated by JC Tan. Instead, Debtors are actively transferring money earned elsewhere into the JC Tan account. This is not a normal small business relationship. In any event, cases are legion supporting the position that using a debtor's wholly owned corporation (or a corporation owned by an individual close to the debtor) to hold assets and pay personal expenses may show the intent necessary to deny

discharge. See e.g., Groman v. Watman (In re Watman), 301 F.3d 3, 8 (1st Cir. 2002); In re Zhang, 463 B.R. at 82–83; Vickers v. Hurley (In re Hurley), 2007 WL 1455983, at *5–6 (Bankr. D. Mass. 2007); Luwisch v. Rabinowitz (In re Rabinowitz), 2012 WL 1072212, at *8 (Bankr. D.N.J. 2012); Emerging Vision, Inc. v. Sundstrom (In re Sundstrom), 374 B.R. 663, 669 (Bankr. E.D. Wis. 2007); Marchand v. Friedman (In re Friedman), 2012 WL 359870, at *6 (Bankr. D.N.J. 2012); In re Turner, 335 B.R. at 762–63. Debtors also note that all JC Tan checks contain the Debtors' names and home address, which Debtors argue illustrates that the use of the account was not intended to hide assets from creditors. However, the JC Tan bank statements do not contain Debtors' names. It is also unclear whether a search performed by a creditor using Debtors' names would turn up the JC Tan account. It also appears highly unlikely that a personal garnishment could attach to a corporate account. Debtors' did disclose the JC Tan account on their bankruptcy petition. While some of this evidence is beneficial for Debtors, Mr. Recupero's deposition testimony indicating he used the JC Tan bank account to shield assets from creditors effectively negates the above evidence.

Debtors also argue that the purchase of the condominium is not evidence of an intent to hinder, delay, or defraud creditors, as Debtors' poor credit prevented them from obtaining a home loan. To solve this problem, Mrs. Reece obtained a loan on the condominium. At least one court has denied discharge under § 727(a)(2)(A) when the same argument was made. In re Jones, 327 B.R. at 303. The court also sees little reason to differentiate between a pre-acquisition and a post-acquisition real estate transfer. For example, if Debtors purchased the condominium in their own name, and then transferred the condominium to Mrs. Reece a month later without receiving adequate consideration, courts would almost certainly find intent sufficient to deny discharge. A different result should not occur simply because Debtors transferred the money necessary to purchase a condominium instead of the condominium itself. Additionally, Debtors' argument that it was Mrs. Reece's idea to purchase the condominium, instead of Debtors' idea, is "an immaterial distinction." In re Oliver, 819 F.2d at 553.

The court understands that a debtor is not required to place all of his assets under a flashing sign and hand out instructions directing creditors to the most effective way to collect on their debts. However, as the Code makes clear, debtors may not engage in actions designed to unduly hinder, delay, or defraud legitimate creditor collection efforts. This results in a balancing act, requiring a court to weigh numerous factors to determine whether a debtor engaged in legitimate financial transactions or illegitimate transfers designed to harm creditors. In the current case, the court finds that: (1) Debtors' transfer of assets to the JC Tan bank account to pay personal expenses; (2) Mr. Recupero's admission that he began using the JC Tan account to avoid creditor attachment; (3) Debtors' unusual relationship with Mrs. Reece that has the effect of protecting the condominium from creditors; and (4) Debtors decision to pay essentially no taxes (even when Debtors' had annual income in excess of $100,000.00 per year) and make various luxury purchases, all indicate that Debtors had the subjective intent to hinder, delay, or defraud creditors in violation of § 727(a)(2)(A). This decision is in line with precedent. For example, in In re Swenson, a case with similar facts, the court denied discharge under § 727(a)(2)(A) when the debtors transferred assets to family members and other close associates while retaining the use and enjoyment of the assets, took income tax deductions on real estate titled in the name of another, failed to pay tax liabilities when sufficient income was available to do so, and made expensive luxury purchases. 381 B.R. 272. Based on all of the above, the court

finds that Debtors acted with the subjective intent necessary to deny discharge under § 727(a)(2)(A).

Debtors have not engaged in the egregious, offensive conduct that accompanies most denial of discharge litigation, but the literal wording of the statute and plentiful cases interpreting it make one point clear. It does not take shocking or spiteful action to meet a standard as low as hinder, delay *or* defraud. This may reflect a congressional policy decision that, once someone is insolvent, society is better served by individual failing at that point, rather than scrambling and dodging and failing later after incurring substantially more debt. This is clearly what happened in this case.

### 3. Argument that Assets are Exempt and Therefore Cannot Harm Creditors

Debtors make one final legal argument in an attempt to convince the court not to deny discharge. Debtors argue that the recent decision of In re Worrell, which has dicta suggesting that a § 727(a)(2)(A) claim may not be successful if exemptions fully cover the property at issue, shows Debtors did not have the subjective intent required to deny discharge. 2013 WL 4525227, at *4–5. Specifically, the court discussed whether a debtor could have the subjective intent to hinder, delay, or defraud a creditor when the creditor has no claim in the exempt asset. Id. The Sixth Circuit addressed a similar situation in In re Keeney, where it analyzed a debtor's defense that the passing of the statute of limitations eliminated any harm to creditors from the debtor's actions, even though debtor's actions would otherwise show the subjective intent to hinder, delay, or defraud. 227 F.3d at 685. The court rejected the statute of limitations argument, noting that "[p]roof of harm is not a required element of a cause of action under Section 727." Id. at 685 (internal quotation marks omitted). While In re Keeney determined that when the intent to harm a creditor is present actual harm is not required, it does not foreclose the argument that a debtor lacked the subjective intent to harm a creditor because the property at issue was exempt.

However, the court need not dig deeper, as the facts between In re Worrell and the current case are easily distinguishable. In In re Worrell, the debtors improperly spent an income tax refund that was completely exempt. 2013 WL 4525227, at *4. However, in the current case, Debtors argue that 75% of disposable earnings exempt. Therefore, while the debtor in In re Worrell had assets that were completely exempt, the assets are only partially exempt in the current case. A debtor may have the subjective intent to hinder, delay, or defraud creditors relating to non-exempt property. Debtors' argument must fail.

### III. Conclusion

Based on the above, Debtors' discharge will be denied under § 727(a)(2)(A). Because the court rules in Trustee's favor under § 727(a)(2)(A), the court need not evaluate Trustee's additional claims under §§ 727(a)(4) or 707(a). An order will be entered simultaneously with this opinion.

#     #     #

15

13-06089-rk    Doc 28    FILED 05/12/14    ENTERED 05/12/14 16:17:26    Page 15 of 16

**Service List**:

**Daniel M McDermott**
Office of the United States Trustee
Howard M. Metzenbaum Federal Courthouse
201 Superior Ave. E. Suite 441
Cleveland, OH 44114

**Derrick Rippy ust11**
Office of the US Trustee
H. M. Metzenbaum U.S. Courthouse
201 Superior Avenue
Suite 441
Cleveland, OH 44114

**James R. Recupero**
6917 Putney Court Ave NW
Massillon, OH 44646

**Christine M. Recupero**
6917 Putney Court Ave NW
Massillon, OH 44646

**Anthony J DeGirolamo**
3930 Fulton Drive NW, Suite 100B
Canton, OH 44718

16